# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **WALTER G. BURNS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 1:11cv0162 AGF** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Walter G. Burns for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Mr. Burns has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Walter Burns (Plaintiff) applied for DIB and SSI in March 2009, alleging he was disabled as of November 15, 2005, by diabetes, a broken hip, obesity, and arthritis in his hips

and shoulders. (R.[1] at 105-15.) His applications were denied initially and after a hearing held in September 2010 before Administrative Law Judge (ALJ) Edward C. Graham.[2] (Id. at 11-21, 26-44, 55-56, 59-63.) The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and George Horne, M.S., testified at the administrative hearing.

Plaintiff testified that he had completed the eleventh grade, but had never obtained a General Equivalency Degree (GED). (Id. at 29.) He was amending his alleged disability onset date to July 26, 2008.[3] (Id.) Asked why he has been disabled since that date, Plaintiff explained that he has back problems, arthritis in his hips, and a recent diagnosis of glaucoma. (Id. at 30.) His back pain is constant and, approximately 75% of the time, radiates to both legs. (Id. at 30-31.) Sometimes, the pain goes to his neck and shoulders. (Id. at 37.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

[2]The hearing was held through video teleconferencing with the ALJ in California and Plaintiff, his counsel, and the other witness in Missouri.

[3]Prior applications for DIB and SSI alleging disability beginning November 15, 2004, were denied by another ALJ on July 24, 2008. (Id. at 46-54.) That ALJ found, inter alia, that Plaintiff had engaged in substantial gainful activity until October 31, 2005; consequently, the relevant period began November 1, 2005. (Id. at 49.) The ALJ also found that Plaintiff had severe impairments of "poorly controlled (due to noncompliance) type II diabetes [diabetes mellitus] and an umbilical hernia"; however, these severe impairments were not disabling. (Id. at 51, 54.) Plaintiff did not seek review of this decision.

Because of the pain, he has difficulties standing and walking and needs to elevate his legs. (Id. at 31-32.) This does not eliminate the pain, but does lessen it. (Id. at 32.) When sitting, he has to change positions to ease the pain. (Id.) He can sit for no longer than thirty minutes. (Id.) He also has neuropathy caused by his diabetes. (Id. at 31.) This causes him to be constantly tired and thirsty. (Id. at 33.) He lacks energy and does not like to be around people. (Id.) Because of his fatigue, he has to nap throughout the day. (Id.) Also, he has blurred vision and cannot grip with his right hand. (Id.) The pain and diabetes interfere with his ability to concentrate and focus. (Id. at 33-34.) He is nauseous three or four times a day. (Id. at 34.) He is slower than he used to be, and cannot maintain an activity for longer than twenty minutes before becoming dizzy and nauseous and experiencing excruciating pain. (Id. at 34-35.) His hernia causes him constant abdominal pain. (Id. at 35.) Because of his depression, he does not like to be around people and has had thoughts of suicide. (Id. at 36.) And, he has anger issues once or twice a day. (Id.) He has difficulty sleeping for any length of time, has sleep apnea, and uses a continuous positive airway pressure (CPAP) machine. (Id. at 36-37.) Twice or thrice a week, severe headaches caused by his diabetes adversely affect his ability to concentrate and focus. (Id. at 37-38.)

There are no side effects from his medications. (Id. at 37.)

He is 5 feet 11 inches tall and weighs 350 pounds, having recently gained 30 pounds. (Id. at 30.) His doctors have told him he is retaining water. (Id.) There is nothing he can do to lose weight because he is not physically able to exercise. (Id.) Plaintiff does not do any household chores. (Id. at 38.) He spends most of the day sleeping. (Id.)

Mr. Horne testified as a vocational expert (VE).  The ALJ asked him about jobs that could be performed by a hypothetical claimant who was 38 years old, had an eleventh grade education, could perform light work[4] with mild pain, could stand or walk six hours out of eight, and could sit six hours occasionally.  (Id. at 39.)  The VE identified jobs as a production assembler, small products assembler, and housekeeper/cleaner.  (Id.)  These jobs exist in significant numbers in the state and national economies.  (Id. at 39-40.)  If the claimant was limited to sedentary,[5] unskilled work, he could work as a general assembler, final assembler, and table worker.  (Id. at 40.)  These jobs also exist in significant numbers in the state and national economies.  (Id.)

The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles* (DOT).  (Id.)

Plaintiff's counsel then asked the VE if a claimant with the limitations described in a Medical Source Statement – Mental, see pages 18 to 19, infra, could perform Plaintiff's past relevant work or any other work.  (Id. at 40-41.)  The VE replied such a claimant could not.  (Id. at 41.)  Nor could a claimant with the limitations described in a Medical Source Statement – Physical, see pages 19 to 20, infra, perform either Plaintiff's past relevant work or any other work.  (Id.)  If, in addition to the limitations described by the ALJ, a claimant needed to lie down three to four times a day for twenty to thirty minutes each time because

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

[5]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

of pain, fatigue, dizziness, and drowsiness, there was no work this claimant could perform. (Id.) If a claimant would have to leave work early or miss work at least one day a week, the claimant would not be able to sustain employment. (Id. at 42.) The VE explained that absence from work at the unskilled level is generally not allowed to exceed eight days a year. (Id.) And, if the claimant had the persistence and pace to work at only half the speed of an unskilled worker due to obesity, uncontrolled diabetes, and significant pain in the shoulders and in the lower back radiating to the legs, the claimant might be able to obtain employment, but could not sustain it. (Id.) If the claimant described by the ALJ also had mood swings, anger issues, and was easily distracted from concentrating on simple tasks, this claimant also would be unable to sustain employment. (Id. at 42-43.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, and records from health care providers.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 154-64.) He listed his height as 6 feet tall and his weight as 330 pounds. (Id. at 154.) He has a medical assistance card. (Id.) He is limited in his ability to work by diabetes, a broken hip, arthritis in his hips and shoulders, and obesity. (Id. at 155.) These impairments cause sleepiness, constant pain, and blurred vision. (Id.) They first bothered him in November 2005 and prevented him from working as of the fifteenth of that month when he was unable to pass a physical and could no longer tolerate the pain. (Id.) The longest job he has held

was as a construction driver.  (Id. at 156.)  He takes Actos and Levemir for his diabetes; Lamisil for "diabetes related problems"[6]; Vicodin for pain; Zestril for high blood pressure; Zocor for high cholesterol; and Zoloft for depression.  (Id. at 162.)  All but the Lamisil are prescribed by Dr. Kurt Zimmer.  (Id.)  None have any side effects.  (Id.)  In addition to having completed the eleventh grade, Plaintiff completed a truck driving program.  (Id. at 163.)

Plaintiff also completed a Function Report.  (Id. at 131-38.)  He lives in a house with family.[7]  (Id. at 131.)  He did not answer the question asking him to describe what he does during the day.  (Id.)  He does not take care of anyone else or of any pets.  (Id. at 132.) Before his impairments, he could do household chores, yard work, dress himself, and see better.  (Id.)  He has sleep apnea caused by his obesity.  (Id.)  Because of his obesity and diabetes, he has to have help putting on his socks and checking his feet.  (Id.)  He needs verbal reminders to take medicine.  (Id. at 133.)  He has meals prepared for him because he cannot stand long enough to do so himself and because he has to have a diabetic diet.  (Id.) Once a day, he walks to the porch, sits and rests, and then returns inside.  (Id. at 134.)  He can drive a car and can go out by himself.  (Id.)  His wife does most of the shopping.  (Id.) He is able to pay bills and handle a checking and savings account.  (Id.)  His hobbies include reading and watching television, although his vision has deteriorated because of the diabetes.

------------------------

[6]Lamisil is prescribed for the treatment of infections affecting the fingernails or toenails.  See Drugs.com, Lamisil, http://www.medilexicon.com/drugsearch.php?s=lamisal (last visited July 23, 2012).

[7]Plaintiff reported on his DIB and SSI applications that he married in November 2007.

(<u>Id.</u> at 135.)  He visits with friends once a week.  (<u>Id.</u>)  Since becoming disabled, he has become depressed and is taking medication. (<u>Id.</u> at 136.)  He prefers being alone.  (<u>Id.</u>)  His impairments affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and see.  (<u>Id.</u> )  They do not affect his abilities to remember, concentrate, complete tasks, understand, follow instructions, or get along with others.  (<u>Id.</u>)  He can only walk for fifty feet before having to rest for five to ten minutes.  (<u>Id.</u>)  He can only pay attention for ten minutes.  (<u>Id.</u>)  He does not finish what he starts.  (<u>Id.</u>)  He has no problem getting along with authority figures.  (<u>Id.</u> at 137.)  He does not handle stress or changes in routine well.  (<u>Id.</u>)

The medical records before the ALJ are summarized below in chronological order and begin in September 2006 when Plaintiff consulted Stephen H. Coats, D.O., about a umbilical hernia he had had for two years.[8]  (<u>Id.</u> at 179-80.)  Also, he thought he might be diabetic.  (<u>Id.</u> at 179.)  He had been working as a truck driver, but was currently unable to do the job.  (<u>Id.</u>)  Dr. Coats described him as morbidly obese and recommended he lose weight.  (<u>Id.</u> at 180.)  If he could, a hernia repair could possibly be performed.  (<u>Id.</u>)  Dr. Coats also recommended that Plaintiff have blood work done to rule out diabetes.  (<u>Id.</u>)

Ten months later, in July 2007, Plaintiff again sought medical care for his hernia.  He then consulted a family nurse practitioner, William Watkins, with Big Springs Medical Associates (Big Springs) about his abdominal hernia of two years' duration and his diabetes.  (<u>Id.</u> at 229-31, 307-13.)  Mr. Watkins counseled Plaintiff about a proper diet – Plaintiff

---

[8]The description of the hernia varies in medical records from being umbilical, abdominal, or ventral (belly).

weighed 370 pounds – and discussed the need for him to lose weight before he underwent a hernia repair.  (Id. at 231.)  A lipid profile was to be done, and Plaintiff was to return in one month.  (Id.)

Three weeks later, on July 25, Plaintiff saw Philma B. Opinaldo, M.D., with Big Springs to review the lab results and to consult about an irritation in his left eye, pain in his abdomen, and warts on several fingers.  (Id. at 227-29, 305–07.)  Also, he and his wife thought he might have sleep apnea.  (Id. at 227.)  His weight was 370.2 pounds.  (Id.)  Dr. Opinaldo referred Plaintiff to diabetic counseling relating to obesity, to a dermatologist for removal of the warts, and to a clinic for surgery on the hernia.  (Id. at 229.)  He was started on lovastatin for his high cholesterol and Naprosyn for pain.  (Id.)

In September, Plaintiff was seen as an outpatient at St. Francis Hospital.  (Id. at 315-16.)  He was able to walk without difficulty, had a normal range of motion, and did not complain of current or recent, past pain.  (Id. at 316.)  His weight was 350 pounds.  (Id.)  His diagnoses were uncontrolled diabetes mellitus, umbilical hernia, obesity, and hyperlipidemia. (Id.)

Plaintiff consulted Bryan D. Eck, M.D., in November about his ventral hernia.  (Id. at 196, 197.)  He weighed 370 pounds.  (Id. at 196.)  Plaintiff reported that he had recently been diagnosed with diabetes and also had hypercholesterolemia.  (Id. at 197.)  He smoked approximately one pack of cigarettes a day and had done so for ten years.  (Id.)  It was decided to repair the hernia with mesh. (Id.)  Subsequently, Plaintiff underwent a hernia repair.  (Id. at 184-85, 201-02, 205-06.)  Dr. Eck noted when examining Plaintiff on

December 10 that Plaintiff planned to travel over the Christmas holiday. (Id. at 194.) After Plaintiff developed a wound hematoma, the wound was drained on December 20. (Id. at 186-87, 199-200, 203-04.) There was no evidence of infection. (Id. at 186.) Plaintiff returned to Dr. Eck for a follow-up on January 2, 2008. (Id. at 190.) Dr. Eck noted that the problem Plaintiff was having with some bleeding at the repair site was due to a stitch having pulled out. (Id.) Another stitch was made at the site. (Id.) Plaintiff was to return in one week, but cancelled the appointment. (Id. at 189, 190.)

In May, Plaintiff consulted a health care provider[9] at the Shannon County Medical Clinic about the depression he had been experiencing for the past four to five months. (Id. at 323-34.) On a scale from one to ten, he rated its severity as a five to six. (Id. at 323.) He could not stand being around other people. (Id.) Also, he was not taking his Metformin – prescribed for the treatment of diabetes mellitus – because it gave him diarrhea. (Id.) He was not in any pain. (Id.) Plaintiff was diagnosed with diabetes mellitus, obesity, depression, and diarrhea due to Metformin. (Id. at 324.) He was placed on a 1500 calorie diet to address his obesity – he then weighed more than 350 pounds – and was given a prescription for Prozac to address his depression. (Id. at 324.)

Plaintiff returned to the Shannon County Medical Clinic on June 6 with complaints of sporadic shooting pain. (Id. at 321-22.) His diagnoses were as before, with the exception of the diarrhea being eliminated. (Id. at 322.) He was continued on his current medications.

---

[9]The signature is illegible; however, a later reference in the October 2008 records of Dr. Zimmer indicates that it is of a Dr. Bruce.

(Id.)  Three days later, he complained of shooting pain in his legs and of hot flashes.  (Id. at 319-20.)  With the exception of his morbid obesity, the physical examination was normal. (Id. at 320.)  Papers were filled out for partial disability.  (Id.)

In August, Plaintiff had an overnight sleep study at St. Francis Hospital Sleep Disorders Center.  (Id. at 262-28.)

Plaintiff returned to Big Springs on October 2 to establish a new primary care physician and was seen by Kurt G. Zimmer, D.O.  (Id. at 224-26.)  He explained that he had had a "'fall[ing] out" with his former physician, Dr. Bruce, at Shannon County Medical Clinic and complained of left hip pain radiating to that knee and of right shoulder pain for the past three months.  (Id. at 224.)  He needed a CPAP machine and had recently been evaluated for gastric bypass surgery.  (Id.)  He was not anxious, but was depressed.  (Id.)  He was alert and oriented to time, place, and person and was in no acute distress.  (Id. at 225.)  Also, he was described as concerned, unhappy, and dysthymic.[10]  (Id.)  His weight was 360 pounds.  (Id.) Dr. Zimmer diagnosed Plaintiff with benign essential hypertension, morbid obesity, diabetes mellitus, and sleep apnea.  (Id.)  He was prescribed Glucagon for his hypoglycemia, Actos

---

[10]A person is dysthymic when he or she  has "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, . . . poor concentration, difficulty making decisions, and feelings of hopelessness."  Stedman's Medical Dictionary, 536 (26th ed. 1995) (Stedman's).

for his diabetes, fluoxetine,[11] Levemir, and lisinopril.[12]  (Id. at 226.)  He was to follow-up in two weeks and have a fasting test done.  (Id.)

On Dr. Zimmer's referral, Plaintiff consulted Clint Vanlandingham, D.P.M., on October 15 to have his feet checked.  (Id. at 210-11.)  Plaintiff reported that his feet had been better since his blood sugars were lowered, but he was still concerned about his thick toe nails, thick calluses, and lack of feeling in his feet.  (Id. at 210.)  His nails were debrided and a nail culture was taken.  (Id.)  Plaintiff was given a prescription for Lamisil tablets and was told to start taking them if his liver function panels – scheduled to be done the next day at Dr. Zimmer's office – were okay.  (Id.)  Dr. Vanlandingham saw no need for Plaintiff to wear "diabetic shoes" and told him to return in three months.  (Id. at 211.)

Two days later, Plaintiff returned to Dr. Zimmer.  (Id. at 221-23.)  He reported that he was "moderately exercising" three times a week.  (Id. at 221.)  Dr. Zimmer administered a psychometric depression scale, but found only, as he had before,  that Plaintiff was dysthymic and concerned.  (Id.)  Rather than being "unhappy" as he was described before, the third adjective used to describe him was "irritable."  (Id.)  Also as before, no psychiatric diagnosis was made.  (Id.)  His fasting glucose levels were better, but were still high.  (Id. at 222.)  He had pain in his left eye, left hip, and right shoulder.  (Id.)  He was alert, in no acute distress, but was oriented to time, place, and person.  (Id.)  X-rays of his right shoulder were

_____

[11]Fluoxetine is the generic form of Prozac.  See Physicians' Desk Reference, 1816 (65th ed. 2011).

[12]Lisinopril is the generic form of Zestril.  See mediLexicon, Prinivil or Zestril (Lisinopril), http://www.medilexicon.com/drugs/prinivil_or_zestril.php (last visited July 23, 2012).

negative, but ones of his left hip showed osteoarthritis and "a loose body." (Id.) Dr. Zimmer's diagnosis was of shoulder joint pain, diabetes mellitus, and osteoarthritis of the left hip. (Id. at 223.) Plaintiff was prescribed Vicodin for the pain. (Id.)

Dr. Zimmer counseled Plaintiff on November 4 about diet, nutrition, and caring for his feet. (Id. at 219-20.) Six days later, Plaintiff telephoned the office to request something stronger than Vicodin (hydrocodone-acetaminophen) for his pain. (Id. at 218-19.) In addition to Vicodin, he was prescribed Tramadol. (Id. at 219.)

When Plaintiff next saw Dr. Zimmer, on November 17, he reported that he had had a cough for two days. (Id. at 216-18.) Also, he was tired. (Id. at 217.) His weight was 358.5 pounds. (Id.) He was continuing to take the Vicodin and Tramadol, along with his medication for high cholesterol and diabetes. (Id.) Dr. Zimmer's diagnosis was shoulder joint pain; sinusitis; morbid obesity; and osteoarthritis in the left hip. (Id. at 218.) Plaintiff was to return in three months for fasting blood work. (Id.)

Two days later, noting that Plaintiff had "practically full range of motion to the right shoulder," Patrick LeCorps, M.D., administered a cortisone injection to the shoulder. (Id. at 182.) A magnetic resonance imaging scan (MRI) had revealed "some inflammation of the supraspinal tendon, which may be causing some impingement."[13] (Id.)

Plaintiff reported to Dr. Zimmer in February 2009 that his blood glucose levels were "much better," e.g., in the 250 mg/dl (milligrams per deciliter) range. (Id. at 213-14.) He continued to have right shoulder pain and also had a knot and burning pain in his right leg.

---

[13]The MRI itself is not in the record.

(Id. at 213.)  Plaintiff reported that he had had an injection in his right shoulder by Dr. LeCorps "but there were some communication problems."  (Id.)  He was alert and oriented to time, place, and person.  (Id.)  His mood was concerned and dysthymic.  (Id.)  His weight was 360 pounds.  (Id.)  Concluding that Plaintiff's blood glucose levels could be further improved, Dr. Zimmer increased his dosage of Levemir.  (Id. at 214.)

A cyst on Plaintiff's right upper leg was biopsied in March.  (Id. at 233-34.)  Plaintiff requested some pain medication; Tylenol or aspirin was recommended.  (Id. at 234.)

Plaintiff was described by Dr. Zimmer as being "variably compliant with his diet" when seen in June 12.  (Id. at 295-96.)  Plaintiff's left hip still hurt.  (Id. at 295.)  His dosage of Levemir was increased, and Plaintiff was to call in one month with a report of his blood glucose values to determine if the dosage needed to be adjusted.  (Id. at 296.)

In August, Plaintiff returned to Dr. Vanlandingham, reporting that his toe nails were clearing and not hurting.  (Id. at 270.)  His feet, however, were burning and making it difficult for him to sleep at night.  (Id.)  He had no joint pain, muscle aches, or muscle cramps.  (Id.)  His mood and affect were "appropriate to [the] situation."  (Id.)  His muscle strength was +5/+5 in all pedal groups.  (Id.)  Deep tendon reflexes were normal.  (Id.)  There was no swelling.  (Id.)  The diagnosis was diabetes mellitus with neuropathy and onychomycosis.[14]  (Id.)  Dr. Vanlandingham explained neuropathy to Plaintiff and discussed

---

[14]Onychomycosis is a "[v]ery common fungus infection[ ] of the nails, causing thickening, roughness, and splitting . . . ."  Stedman's at 1248.

with him the need to control his blood sugar levels. (Id.) He was to try Lidoderm and, possibly, Neurontin and to return in six months or sooner if medically necessary. (Id.)

Plaintiff was seen by Beverly Denton, a board-certified family nurse practitioner, at the Summerville Medical Clinic on October 15 for complaints of leg and left hip pain caused by a 2005 motor vehicle accident and becoming worse during the past week. (Id. at 358-65.) The pain was a seven on a ten-point scale. (Id. at 358.) Other than a decreased range of motion in both hips and in his left knee, his physical examination was normal. (Id. at 358-59.) The diagnoses were uncontrolled diabetes mellitus without complications; joint pain in multiple sites; malaise and fatigue; and hypertension. (Id. at 359.) He returned four days later for a refill of his medications. (Id. at 283, 289-90.) His problems were uncontrolled diabetes mellitus and hyperlipidemnia. (Id. at 289.) On October 28, when Plaintiff returned to discuss the results of lab work, the pain was a six. (Id. at 354-56.)

On November 19, Plaintiff consulted Rani K. Radhamma, M.D., for his diabetes, diagnosed seven years earlier and described as without complications and uncontrolled. (Id. at 367-78.) Dr. Radhamma noted that Plaintiff had no consistency in his meal pattern, breakfasting at ten o'clock in the morning after waking up at seven, snacking at five o'clock in the evening, and dining at seven. (Id. at 372.) His weight had been fluctuating. (Id. at 372.) Dr. Radhamma advised Plaintiff that consistency was essential to controlling his diabetes. (Id. at 375.)

He saw Ms. Denton again on December 7 to get the results of a culture and for a refill of his medications. (Id. at 279, 284-88.)

When he next saw Ms. Denton for refills, in April 2010, an antifungal antibiotic, Fluconazole, was added to his medication regimen. (Id. at 280-82.)

Plaintiff saw Dr. Zimmer in May, reporting having knots in his low back and pain in his right shoulder. (Id. at 292-94.) On examination, his right shoulder was tender, but had a full range of motion. (Id. at 292.) Dr. Zimmer had been informed by the pharmacy that Plaintiff had filled his prescription for Actos only twice since December 2009. (Id. at 292.) He had been filling prescriptions for simvastatin and Levemir. (Id.) As before, Dr. Zimmer simply described Plaintiff's mood as concerned and dysthymic. (Id. at 293.) Plaintiff was prescribed ibuprofen and counseled about a proper diet. (Id. at 294.) Plaintiff requested a referral to a pain management specialist and a dermatologist. (Id.)

On June 4, Plaintiff consulted Nicholas Shoults, M.D., about his umbilical hernia. (Id. at 298-303.) He described the discomfort as intermittent aches made worse by any movement, lifting, and bending and made better by lying down. (Id. at 299.) The aches were accompanied by nausea and vomiting. (Id.) On examination, Plaintiff had no chest, back, neck, or joint pain. (Id. at 301.) He was alert, cooperative, and in no distress. (Id.) He was to have a computed tomography (CT) scan of his hernia. (Id. at 302.) Also, he was interested in bariatric surgery. (Id.)

On June 16, Plaintiff did see a pain management specialist, Ron Ellis, M.D. (Id. at 345-47.) Plaintiff explained that he had had back and bilateral hip pain since being in a truck accident in 2005. (Id. at 345.) A year or two later, he had been diagnosed as having a right hip fracture, but had been advised against having surgery due to his weight. (Id.) Plaintiff

described his pain as a mostly sharp, burning pain radiating across both sides of his lower back and down through his hips to his legs and feet. (Id. at 346.) There was also intermittent numbness. (Id.) On a scale from one to ten, the pain was a seven. (Id.) It was aggravated by walking, standing, or bending and alleviated by sitting. (Id.) He could walk without an assistive device. (Id.) He had more recently had MRIs ordered of his spine and hips; he had not had them done. (Id. at 345.) X-rays taken the month before of his lumbar spine revealed degenerative disc changes at L2-3 and L4-5, but no other findings of any significance. (Id. at 346.) His medical history included arthritis, morbid obesity, hypertension, insulin-dependent diabetes mellitus, and depression. (Id.) He smoked one pack of cigarettes a day. (Id.) On examination, he was awake, alert, and in no acute distress. (Id.) His gait was slow, wide-based, and stiff. (Id.) His range of motion in his lumbar spine was limited to ten degrees on flexion and on extension. (Id.) There was no apparent muscle wasting in his lower extremities. (Id.) Babinski signs[15] and seated straight leg raises[16] were both negative. (Id.) He had diffuse nonspecific gluteal and proximal thigh tenderness laterally and posteriorly. (Id.) Dr. Ellis opined that Plaintiff's chronic back and bilateral hip pain was due to a chronic lumber strain/sprain. (Id.) He found no evidence of specific radiculopathy, myelopathy, or facet or sacroiliac involvement. (Id.) He was going to "try" to send Plaintiff

_____

[15]A Babinski sign is positive if the big toe goes up when the sole of the foot is stimulated. MedicineNet.com, Definition of Babinski Sign, http://www.medterms.com/script/main (last visited July 23, 2012). A positive sign indicates a problem in the central nervous system. Id.

[16]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

for an MRI of his lumbar spine and hips and counseled him to stop smoking and to lose weight. (Id.)

The following month, on July 6, Dr. Ellis gave Plaintiff an interlaminar epidural steroid injection at L4-L5. (Id. at 339-44.) Plaintiff reported that this injection gave him 50% relief for two weeks. (Id. at 334.) Consequently, on August 3, he had a second injection. (Id. at 333-38.)

Plaintiff reported to James R. Perry, D.O., on August 7 that his blood sugar levels were stable and in the 300s. (Id. at 329.)

Also before the ALJ were various assessments of the limitations caused by Plaintiff's impairments.

In June 2009, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Jennifer Baldwin, who was a "single decisionmaker"[17] and not a medical consultant. (Id. at 246-52.) The primary diagnosis was obesity; the secondary diagnosis was diabetes; other impairments included chronic shoulder and hip pain. (Id. at 246.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk about two hours in an eight-hour day; and sit for about six hours in an eight-hour day. (Id. at 247.) His ability to push and pull was unlimited with the exception of the lifting and

_____

[17]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

carrying restrictions.  (Id.) Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 249-50.)

The same month, Alan Aram, Psy.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 235–45.)  He assessed Plaintiff as having an affective disorder, i.e., depression, which was not severe.  (Id. at 235, 237-38.)  The disorder resulted in mild difficulties in maintaining social functioning, but in no restrictions of activities of daily living and no difficulties in maintaining concentration, persistence, or pace.  (Id. at 243.)  And, the disorder did not result in any episodes of decompensation of extended duration.  (Id.)

In December 2009, Ms. Denton completed a Medical Source Statement – Mental for Plaintiff.  (Id. at 272-73.)  She assessed Plaintiff as being moderately limited in two of the three abilities listed for the category of understanding and memory:  the ability to remember locations and work-like procedures and the ability to understand and remember detailed instructions.  (Id. at 272.)  Plaintiff was not significantly limited in the third ability, i.e., understanding and remembering very short and simple instructions.  (Id.)  In the ten abilities[18] listed in the category of sustained concentration and persistence, Plaintiff was not significantly limited in his ability to carry out very short and simple instructions.  (Id.)  He was moderately limited in eight of the nine remaining abilities, including being able to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; being able to sustain an ordinary routine without special supervision;

---

[18]There apparently was an eleventh ability.  The description is incomplete, and there is no associated rating of Plaintiff's degree of limitation.

and being able to make simple work-related decisions.  (Id.)  He was markedly limited in his ability to work in coordination with or proximity to others without being distracted by them. (Id.)  Plaintiff was also moderately limited in one of the five abilities listed under "Social Interaction," i.e., the ability to interact appropriately with the general public, and not significantly limited in one other, i.e., the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Id. at 273.)  He was moderately limited in the remaining three abilities, including being able to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Id.)  Plaintiff was moderately limited in all four abilities listed in the "Adapt" category, including being able to respond appropriately to changes in the work setting and to travel in unfamiliar places or use public transportation.  (Id.)

Ms. Denton also completed a Medical Source Statement – Physical for Plaintiff.  (Id. at 275-76.)  She assessed him as being able to frequently or occasionally lift and carry five pounds; to continuously stand, walk, or sit for less than fifteen minutes; and to stand, walk, or sit during an eight-hour day for less than one hour.  (Id. at 275.)  He was limited in his ability to push or pull; she did not explain how.  (Id.)  Plaintiff had postural limitations of never climbing, stooping, kneeling, crouching, or crawling.  (Id. at 276.)  He could occasionally balance.  (Id.)  He had environmental limitations of needing to avoid any

exposure to extreme cold or heat, dust, fumes, hazards, and heights.[19]  (Id.)  He should avoid moderate exposure to wetness, humidity, and vibrations.  (Id.)  Because of his pain, Plaintiff would have to lie down for an hour during an eight-hour work day.  (Id.)  Because of his pain medication, Plaintiff had decreased abilities to concentrate, persist, and pace himself.  (Id.)

Dr. Perry reported on a Visual Impairment Sheet in September 2010 that Plaintiff had normal myopia with 20/20 correction and normal depth perception, peripheral vision, and accommodation.  (Id. at 331.)  His field of vision in his left eye was normal and was reduced in his right eye.  (Id.)

## The ALJ's Decision

The ALJ first noted that Plaintiff had sufficient earnings to satisfy the Act's insured status requirements through December 31, 2010.  (Id. at 16.)  He then noted that Plaintiff's prior applications for DIB and SSI had been denied on July 24, 2008, after a hearing and had not been pursued further.  (Id.)  The ALJ held that the Ninth Circuit Court of Appeals in Chavez v. Bowen, 884 F.2d 691 (9th Cir. 1988), required that he adopt findings from the prior adverse decision that Plaintiff could perform medium exertional work before November 31, 2005, to January 1, 2007; light work from January 1, 2007, through November 29, 2007; and sedentary work beginning November 30, 2007, unless there was relevant new and material evidence.  (Id. at 16-17.)  He determined, however, that there was not.  (Id. at 17.)

_____

[19]Ms. Denton also assessed Plaintiff as needing to avoid any exposure to "weather."  The seemingly impossible nature of this limitation is not explained.

The evidence established that Plaintiff had not engaged in substantial gainful activity since his initial alleged onset date of November 15, 2005. (Id.) He had severe impairments of obesity and Type II diabetes mellitus with peripheral neuropathy. (Id.) He did not have, however, an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.) Specifically, his ventral hernia was surgically repaired in November 2007. (Id.) His "musculosketal problems, shoulder, back, hips and knee, problems" were primarily due to his obesity. (Id.) He had been encouraged to lose weight. (Id.) The ALJ noted the "overly generous" assessments of Ms. Denton but declined to give them any weight because they were not supported by the objective medical records and she was not a doctor. (Id. at 17-18.) The longitudinal medical record did not support Plaintiff's claim that he satisfied Listings 1.04 (disorders of the spine) and 4.02 (chronic heart failure). (Id. at 18.)

The ALJ also declined to give weight to Plaintiff's testimony about his pain because it was not supported by the objective findings and record. (Id.) There was little evidence of treatment. (Id.) He was not participating in physical therapy, had not recently been referred to a pain clinic, denied taking pain medication, and only lay down and elevated his legs to relieve the pain. (Id.) There was no corroboration that pain had deprived him of sleep, caused him to lose his appetite, or interfered with his concentration, attention, or cognitive functioning. (Id.) The ALJ described Plaintiff's appearance at the hearing as being of a "large individual with a weight of 350 pounds and a height of 5 feet 11 inches, however, there he did not appear to have a disabling condition." (Id.) Also detracting from his credibility

was his daily activities as outlined on the Function Report, his apparent lack of motivation to work, and his planning a trip in December 2007. (Id.)

Plaintiff had, the ALJ concluded, the residual functional capacity (RFC) to perform light work except with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Id.) With this RFC, he was unable to perform his past relevant work as a dump truck driver. (Id. at 19.) With his RFC, age, and limited education, Plaintiff could, according to the VE's testimony, perform the requirements of the seven jobs described by the VE. (Id. at 20.) He was not, therefore, disabled within the meaning of the Act. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate

analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). "'[A] claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v.**

**Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). Thus, in determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within

the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different

conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789). <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## <u>Discussion</u>

Plaintiff argues that the ALJ erred (1) by not evaluating and discussing at step two his severe mental impairments, hernia, and low back and hip pain; (2) when determining his RFC; and (3) when evaluating his credibility. The Commissioner disagrees.

Before the merits of Plaintiff's arguments may be reached, the boundaries of the time period within which those merits are to be examined must be defined. As noted by ALJ Graham, a prior decision rendered after a hearing found Plaintiff not to be disabled as of July 24, 2008. ALJ Graham declined to reopen that decision. Absent, as in the instant case, a constitutional challenge, his refusal is not subject to judicial review under § 405(g). <u>See</u> **Efinchuk v. Astrue**, 480 F.3d 846, 848 (8th Cir. 2007); **Boock v. Shalala**, 48 F.3d 348, 351 (8th Cir. 1995). At the hearing held pursuant to Plaintiff's current applications, his alleged disability onset date was amended to July 26, 2008. Consequently, to the extent that Plaintiff might argue that he was disabled prior to July 2008, those arguments are not to be entertained.

<u>Severe Impairments.</u> Plaintiff first argues that the ALJ erred by not evaluating and discussing his severe depression, hernia, and low back and hip pain.

A severe impairment

"must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, *not only by [the claimant's] statement of symptoms* (see [20 C.F.R.] § 404.1527)."

**Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508) (alteration in original) (emphasis added).  See also 42 U.S.C. § 423(d)(5)(A) (requiring that a claimant's complaints of pain or symptoms not be conclusive evidence of disability but there also be "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques").  Pain is a symptom, not an impairment.  See 20 C.F.R. §§ 404.1569a(a), 416.969a(a).

Plaintiff notes that he was diagnosed by Dr. Bruce with depression and that Dr. Zimmer routinely described his mood as dysthymic, concerned, and irritable.  The diagnosis by Dr. Bruce – a physician that Plaintiff soon stopped seeing because of a disagreement – was made based on Plaintiff's complaint about depression for the past four to five months.  The diagnosis and complaint were made ten months before Plaintiff filed his DIB and SSI applications, in neither of which he listed depression as a disabling impairment.  See **Kirby v. Astrue**, 500 F.3d 705, 708-09 (8th Cir. 2007) (affirming ALJ's finding that claimant did not suffer significant impairment due to psychiatric illness; initial disability form did not claim such impairment); **Page v. Astrue**, 484 F.3d 1040, 1044 (8th Cir. 2007) (affirming ALJ's finding at step two that depression was not severe when, inter alia, claimant did not allege mental impairment in disability application); **Dunahoo**, 241 F.3d at 1039 (rejecting

argument that ALJ had erred by not finding depression to be severe impairment; "[t]he fact that [the claimant] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed"). The few adjectives used by Dr. Zimmer to describe Plaintiff's appearance and mood never varied, e.g., he was alert, in no acute distress, concerned, dysthymic, and irritable. The only diagnostic technique employed by Dr. Zimmer to assess Plaintiff's depression did not result in a diagnosis of, or any treatment other than sporadically prescribed medication for, depression.

Plaintiff also cites his testimony about fatigue, depression, insomnia, suicidal ideation, difficulty concentrating, and difficulty focusing in support of his argument that his depression is severe. Insofar as this argument relies on his testimony being found to be credible, it is unavailing for the reasons set forth below. Moreover, the testimony is inconsistent with his observations on the Function Report that (a) his impairments did not affect his abilities to concentrate, remember, complete tasks, and get along with others and (b) his weekly visits with friends.[20]

Additionally, other than complaints to Dr. Bruce in May 2008 and to Dr. Zimmer in May and October of 2008 about depression – all made before Plaintiff applied for DIB and SSI and before the amended alleged disability onset date – Plaintiff did not seek any treatment for his depression. See **Buckner v. Astrue**, 646 F.3d 549, 557 (8th Cir. 2011) (ALJ did not

---

[20]Plaintiff cites the remark of his wife when completing a three-page questionnaire requiring primarily check-mark responses or lists of doctors and people knowledgeable about his condition that paper work caused Plaintiff stress and that he could not concentrate long enough to complete the questionnaire. He had, however, completed an eight-page Function Report requiring descriptive answers. Moreover, in his brief, Plaintiff mistakenly attributes to his wife the completion of the Function Report as well as the questionnaire. (See Pl.'s Br. at 15, ECF No. 12.)

err in not finding claimant's diagnosed depression and anxiety to be severe impairments when claimant complained twice about medication not helping with depression, he had normal psychological evaluations, and he had several visits to same practitioner where he did not raise concerns about depression or effectiveness of medication); **Partee**, 638 F.3d at 864 (holding that the failure to seek mental treatment is a relevant consideration when evaluating a claimant's mental impairment); **Kirby**, 500 F.3d at 708-09 (affirming ALJ's finding that claimant did not suffer significant impairment due to psychiatric illness when claimant had never had any formal treatment by psychiatrist, psychologist, or other mental health professional on a long-term basis); **Cox v. Barnhart**, 471 F.3d 902, 906, 908 (8th Cir. 2006) (affirming denial of benefits when claimant had presented no evidence that she had been treated by mental health professional); **Roberts v. Apfel**, 222 F.3d 466, 469 (8th Cir. 2000) (affirming ALJ's conclusion that mental impairments were not disabling when there was no evidence "of ongoing counseling or psychiatric treatment or of deterioration of change in [claimant's] mental capabilities"); **Jones v. Callahan**, 122 F.3d 1148, 1153 (8th Cir. 1997) (affirming ALJ's finding that claimant's mental impairment was not severe based on, inter alia, lack of any regular treatment by mental health professional, although claimant "might experience some difficulties associated with his mental or emotional health").

The first reference in the medical records to a hernia is when Plaintiff reported to Dr. Coats in 2006 that he had had one for two years. He was advised to lose weight. The following year, he complained to a different physician of a hernia. He was advised to lose weight. Two months later, when seeing that physician, Plaintiff did not mention the hernia.

He did undergo a successful hernia repair the year before his amended alleged disability onset date. Twenty months after that onset date, Plaintiff again consulted Dr. Shoults about his hernia. He was to have a CT scan of the hernia. He did not. Nor did he mention any hernia-related pain when seeing Dr. Ellis, a pain management specialist, twelve days later. In response to the lack of any evidence in the record that his hernia was severe, Plaintiff cites his own description, including the one to Dr. Shoults, of the resulting pain. As noted above, however, to be found severe at step two an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques" and not only by a claimant's statements. <u>See</u> 20 C.F.R. § 404.1508. Plaintiff did not follow through on Dr. Shoults' direction to have a CT scan, thereby leaving the record without evidence of any such techniques.

Plaintiff argues that there is medically acceptable evidence of his hip and back pain, i.e., x-rays cited in Dr. Zimmer's June 2009 records, x-rays of his lumbar spine in May 2010, and a limited range of motion in June 2010. The ALJ did not, however, fail to address Plaintiff's complaints of hip and back pain. Rather, he found such pain was due to Plaintiff's obesity – an impairment he did find to be severe.

For the foregoing reasons, Plaintiff's first argument is unavailing.[21]

---

[21] Also unavailing is Plaintiff's reliance on **May v. Astrue**, 2010 WL 3257848 (W.D. Mo. 2010), in support of his argument. In that case, the court found that the ALJ had erred by failing to address alleged impairments of traumatic brain injury, vertigo, obesity, anxiety, and coronary artery disease. **Id.** at * 9. The ALJ had mentioned diagnoses of traumatic brain injury and coronary artery disease, but failed to explain why they were not severe and to even mention the vertigo, obesity, and anxiety. **Id.** In the instant case, the ALJ found the hernia to have been repaired in 2007 and the pain to be caused by Plaintiff's obesity. And, although he did not specifically address the issue of Plaintiff's depression, unlike in **May**, 2010 WL 3257848 at *3-4, there is no evidence of any ongoing treatment

Residual Functional Capacity. "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitation." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment"). An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Depover**, 349 F.3d at 567. Instead, an ALJ who specifically addresses the areas in which he found a limitation and is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See also **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not

_____

for it.

required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (finding it "highly unlikely that the ALJ did not consider and reject" portions of report given the ALJ's explicit reliance on other portions of report).

In the instant case, the ALJ discussed those of Plaintiff's functional limitations established by the record, which was, as noted by the Commissioner, brief. See **Young v. Apfel**, 221 F.3d 1065, 1069 (8th Cir. 2000) (rejecting claimant's argument that ALJ had erred by not supporting RFC with medical evidence when ALJ had discussed what records there were).

Indicative of allegedly disregarded evidence of a more restrictive RFC, Plaintiff cites the two assessments by Ms. Denton, a family nurse practitioner. It is undisputed that a family nurse practitioner is not an acceptable medical source whose evidence can establish an impairment. See 20 C.F.R. §§ 404.1513(a), 416.913(a). Evidence from a family nurse practitioner may be considered when assessing the severity of an impairment. See 20 C.F.R. §§ 404.1513(d)(1), 416.923(d)(1). Ms. Denton's evidence, however, is not probative for reasons other than her professional qualifications. She treated Plaintiff only twice, once in October 2009 when he consulted her to establish care and once three days later for a follow-up visit. Plaintiff did not complain of knee pain, debilitating pain, or depression during these two visits. At the first visit, he complained of leg and left hip pain originating in 2005 and he had a decreased range of motion in both hips and knees. When consulting a physician the following month, Plaintiff did not complain of pain or depression. When he next saw Ms.

Denton, in December 2009, and again in April 2010, it was for medication refills. Regardless of the brevity of scope and duration of Ms. Denton's treatment of Plaintiff, she opined about his mental and physical abilities, including ones that were refuted, or not established, by the record. For instance, e.g., he was moderately limited in his ability to travel in unfamiliar places although the only reference to travel in the record is his plans to do so one Christmas. He needed to avoid exposure to extreme cold or heat, but no such problem is mentioned in the record. Ms. Denton's assessments are clearly based on Plaintiff's statements.[22] See **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible"). Thus, regardless of whether Ms. Denton is an acceptable medical source, the ALJ did not err in not giving weight to her two assessments of Plaintiff's RFC. See **Renstrom**, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts).

Nor did the ALJ err by not obtaining the opinion of a treating or consulting physician in an effort to lend support to Ms. Denton's assessments. "While '[a]n ALJ should recontact

---

[22]Plaintiff contends that Ms. Denton's "records contain abnormal objective findings, prescription drug therapy, laboratory testing, and records from other specialists as well." (Pl.'s Br. at 12-13.) Her records do list the medications Plaintiff is taking. They also refer to laboratory tests and x-rays to be done. (See R. at 355.) The results are not in the record. Indeed, there is no indication Plaintiff had the x-rays of his hip and knee taken. And, although she sometimes lists Plaintiff's medical history, that history consists of his prior diagnoses. (See R. at 33.)

a treating or consulting physician if a critical issue is undeveloped,' 'the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.'" **Martise**, 641 F.3d at 926-27 (quoting Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010) (alteration in original) (holding that "lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians") (internal quotations omitted) (alteration in original).

Plaintiff's final challenge to the ALJ's RFC findings is that the ALJ erred by not including such limitations as his headaches, vision problems, sleep disorder, mental impairment, hip and back pain, hernia, and medication side effects. As noted above, however, the ALJ need only include those limitations he finds to be established by the record. "[The Court] review[s] the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but [the Court] do[es] not require an ALJ to mechanically list and reject every possible limitation." **McCoy**, 648 F.3d at 615. The omitted limitations depend on Plaintiff being found credible, which the ALJ did not find.

Credibility. When explaining his credibility determination, the ALJ noted that he had considered the factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996), considerations which mirror the Polaski factors, see pages 23 to 24, supra.[23]

---

[23]An ALJ's credibility findings are not negated by a failure to specifically cite Polaski when the relevant factors are considered. See **Buckner**, 646 F.3d at 559.

Considerations which the ALJ found were detractors from his credibility were the lack of supporting objective medical evidence, his daily activities, inconsistencies in the record, and his demeanor at the hearing.

The absence of objective medical evidence to support a claimant's complaints is *a* proper consideration when assessing that claimant's credibility. **Renstrom**, 680 F.3d at 1065; **Halverson v. Astrue**, 600 F.3d 922, 932-33 (8th Cir. 2010); **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008). See also **Roberson**, 481 F.3d at 1025 ("[A]n ALJ may take the claimant's medical records into account when determining his or her credibility, and may discount the claimant's subjective complaints if there are inconsistencies in the record as a whole.").

Also relevant is the inconsistency between Plaintiff's testimony about his severely restricted daily activities and his description on his Function Report of his abilities to take care of himself. See **Renstrom**, 680 F.3d at 1067 (daily activities, including daily chores and ability to provide self care, "indicated a lesser impairment than [claimant] claimed in testimony). Moreover, Plaintiff's testimony is inconsistent with the paucity of treatment. **Id.** at 1066 (severity of reported impairments inconsistent with medical evidence and course of treatment).

Plaintiff argues that the ALJ placed too much emphasis on his observations of Plaintiff at the hearing. "[An] ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). See also **Smith v. Shalala**, 987 F.2d 1371, 1375 (8th Cir.

1993) (observation by ALJ that claimant had not appeared uncomfortable during hearing was properly considered as detracting from claimant's credibility). The ALJ's reference to Plaintiff's demeanor does not equate to a rejection of his credibility because he did not "sit and squirm during the hearing." **Cline v. Sullivan**, 939 F.2d 560, 56-68 (8th Cir. 1991) (citing Reinhart v. Secretary of H.H.S., 733 F.2d 571, 573 (8th Cir. 1984) (holding that ALJ was "not free to reject claimant's complaints of pain *solely* on the basis of the personal observations made of the claimant during the hearing") (emphasis added)).

In the instant case, the ALJ recognized the relevant considerations and gave multiple, valid reasons for finding Plaintiff not credible. Plaintiff's argument to the contrary is without merit.[24] See **Tucker v. Barnhart**, 363 F.3d 781, 783 (8th Cir. 2004) (ALJ is not required to discuss each credibility factor as long as analytical framework is recognized and considered).

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly,

---

[24]Plaintiff's reference to his sleep deprivation as supportive of his credibility is unavailing. Plaintiff sought and received treatment for his sleep apnea. The only support for his complaint of sleep deprivation is that complaint.

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  1st  day of August, 2012.